1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  DAVID VELASQUEZ,                          No. 2:06-cv-02618 JCW

12              Petitioner,                    ORDER

              vs.

13  ROBERT A. HOREL,

14              Respondent.

15  _____

16

17        Velasquez, a state prisoner, filed a petition for a writ of habeas corpus

18  pursuant to 28 U.S.C. § 2254.  He does not challenge his 1982 conviction for

19  second degree murder, for which he received a prison term of fifteen years to life.

20  Rather, he argues that the California Board of Parole Hearings' (Board) February

21  17, 2005 decision denying him parole violates his constitutional rights.

22        On July 28, 2009, this case was ordered stayed pending the Court of Appeals

23  of the Ninth Circuit's en banc decision in *Hayward v. Marshall*; that opinion was

24  filed this spring, *see Hayward v. Marshall*, 603 F.3d 546 (9th Cir. Apr. 22, 2010)

25  (en banc), and thus Velasquez's case may now proceed.  I have reviewed the

26  petition, the respondent's answer, the traverse, and all supporting documents.  I

1

1  hold that Velasquez is not entitled to the relief requested and order the petition

2  denied.

**I.**

4  The following is a summary of the facts surrounding Velasquez's underlying

5  offense, as found in a probation report that was read into the record at the parole

6  hearing:

> The material facts of the present offense as determined from materials in the district attorney's file and conversations with the investigating officer, would appear to be as follows:
>
> On November 13, 1981, the defendant became involved in an altercation at the residence of Linda Benjamin at 11051 Venice Boulevard in West Los Angeles. There have been various accounts as to the cause of the altercation between the defendant and the victim Pam Martinelli. The account that the most witnesses seem to agree upon is that the deceased victim indicated that she was going to inform on the defendant. It appears that [the victim] was leaving when codefendant Allen Ochoa stopped her outside and began striking her with his fists. It appears that the defendant then approached her with an ice pick that he kept in his van and began stabbing her. She was stabbed 16 times in the chest with wounds puncturing her heart, aorta, and lungs. Her throat was also slashed three times. Her body was then dumped in a trash bin at 4901 Slauson Avenue in Culver City. It was discovered there the following morning. Witnesses who were present at the time the altercation broke out and who later heard this defendant and the codefendant say they had killed her, informed the police and investigation led to the arrest of the defendant and codefendant approximately one month later.

19  On July 27, 1982, Velasquez was convicted of one count of second degree

20  murder. On September 23, 2003, Velasquez was granted parole following a

21  hearing. On February 24, 2004, the grant of parole was reversed by the Governor,

22  who cited the brutal nature of the crime and the fact that his explanations of what

23  happened on the night of the murder and his motive had changed several times

24  over the years, with Velasquez presenting differing versions as recently as 2003.

25  The Governor stated that Velasquez's criminal history included robbery, burglary,

26  and possession of marijuana. The Governor also pointed to conflicting evaluations

1  of his risk to the public, and that his most recent evaluation found he would pose a

2  high degree of threat to the public, even though an evaluation from 2002 by a

3  different evaluator found only a moderate to low degree of threat to the public.

4  The Governor expressed concern over Velasquez's lack of clear employment plans

5  if he were to be paroled.

6         On February 17, 2005, Velasquez appeared before the Board for another

7  parole hearing.  At the close of the hearing, parole was denied.  Velasquez has now

8  been considered for parole nine times.

9                                              **II.**

10        A person in custody pursuant to the judgment of a state court may petition a

11  district court for relief by way of a writ of habeas corpus if the custody is in

12  violation of the Constitution, laws, or treaties of the United States.  28 U.S.C.

13  § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7

14  (2000). Velasquez asserts that he suffered violations of his rights as guaranteed by

15  the Constitution.  The petition was filed after the enactment of the Anti-terrorism

16  and Effective Death Penalty Act of 1996 (AEDPA), and it is therefore governed by

17  the AEDPA.  *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010).  Thus,

18  Velasquez's petition may be granted only if he demonstrates that the state court

19  decision denying relief "resulted in a decision that was either (1) contrary to, or

20  involved an unreasonable application of, clearly established Federal law, as

21  determined by the Supreme Court of the United States, or (2) based on an

22  unreasonable determination of the facts in light of the evidence presented in the

23  State court proceeding."  *Id*. (internal quotation marks omitted), *citing Doody v.

24  Schriro*, 596 F.3d 620, 634 (9th Cir. 2010) (en banc).

25        As a threshold matter, I must "first decide what constitutes 'clearly

26  established Federal law, as determined by the Supreme Court of the United

3

1  States.'"  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), *quoting* 28 U.S.C.

2  § 2254(d)(1)).  To do this, federal courts look to the "holdings, as opposed to the

3  dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court

4  decision," *id.*, *citing Williams*, 529 U.S. at 412, and consider whether the state

5  court decision was "contrary to, or involved an unreasonable application of, clearly

6  established Federal law." *Id.*, *quoting* 28 U.S.C. § 2254(d)(1)).  "Under the

7  'contrary to' clause, a federal habeas court may [issue] the writ if the state court

8  arrives at a conclusion opposite to that reached by [the Supreme] Court on a

9  question of law or if the state court decides a case differently than [the Supreme]

10  Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at

11  412-13.  "Under the 'unreasonable application clause,' a federal habeas court may

12  grant the writ if the state court identifies the correct governing legal principle from

13  [the Supreme] Court's decisions but unreasonably applies that principle to the facts

14  of the prisoner's case." *Id.* at 413.  "[A] federal habeas court may not issue the

15  writ simply because that court concludes in its independent judgment that the

16  relevant state-court decision applied clearly established federal law erroneously or

17  incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  A

18  federal habeas court making the "unreasonable application" inquiry should ask

19  whether the state court's application of clearly established federal law was

20  "objectively unreasonable." *Id.* at 409.  Although only Supreme Court law is

21  binding on the states, precedent of the Court of Appeals for the Ninth Circuit

22  remains relevant persuasive authority in determining whether a state court decision

23  is objectively unreasonable. *See Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th

24  Cir. 2000) ("because of the 1996 AEDPA amendments, [the court] can no longer

25  reverse a state court decision merely because that decision conflicts with Ninth

26  Circuit precedent on a federal Constitutional issue. . . . This does not mean that

4

1    Ninth Circuit caselaw is never relevant to a habeas case after AEDPA.  Our cases

2    may be persuasive authority for purposes of determining whether a particular state

3    court decision is an 'unreasonable application' of Supreme Court law, and also

4    may help us determine what law is 'clearly established'").  Furthermore, the

5    AEDPA requires that federal courts give considerable deference to state court

6    decisions.  The state court's factual findings are presumed correct, 28 U.S.C. §

7    2254(e)(1), and a federal habeas court is bound by a state's interpretation of its

8    own laws.  *Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002).

9         We apply the AEDPA's standards to "the last reasoned decision" by a state

10   court adjudicating a petitioner's claims.  *Barker v. Fleming*, 423 F.3d 1085, 1091

11   (9th Cir. 2005).  Here, the California Supreme Court denied Velasquez's petition

12   for writ of habeas corpus, citing California state cases *In re Dannenberg*, 34 Cal.

13   4th 1061, 1084, 1091, 1094 (2005); *In re Rosenkrantz*, 29 Cal. 4th 616, 638, 685,

14   686 (2002); *People v. Duvall*, 9 Cal. 4th 464, 474 (1995); *People v. Crittenden*, 9

15   Cal. 4th 83, 120 n.3 (1994); *In re Clark*, 5 Cal. 4th 750, 768 (1993); *In re Miller*,

16   17 Cal. 2d 734 (1941).  The respondent in this case concedes that Velasquez

17   exhausted his state judicial remedies regarding his due process claims as they

18   pertain to the Board's February 2005 parole denial, and that Velasquez's petition is

19   timely.

20                                          **III.**

21        Velasquez's primary contention is that the Board's denial of parole was not

22   supported by any evidence, and he has therefore been denied due process of law.

23   To make a valid claim that his due process rights have been violated, a petitioner

24   must first have "a liberty or property interest which has been interfered with by the

25   State."  *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  The

26   Court of Appeals for the Ninth Circuit has recognized that, as a matter of federal

law, the relevant Supreme Court decisions do not require "some evidence" to support a denial of parole. *Hayward v. Marshall*, 603 F.3d 546, 558-59 (9th Cir. 2010) (en banc). Thus, for purposes of habeas petitions, "[i]f there is any right to release on parole, or to release in the absence of some evidence of future dangerousness, it has to arise from substantive state law creating a right to release." *Id*. at 555; *see also id*. at 559 ("[t]here is no general federal constitutional 'some evidence' requirement for denial of parole, in the absence of state law creating an enforceable right to parole"). Although *Hayward* concluded that there is no free-standing federal due process right to parole or the federal right to some evidence of current dangerousness, "state-created rights may give rise to liberty interests that may be enforced as a matter of federal law." *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010). *Pearson* held that "California has created a parole system that independently requires the enforcement of certain procedural and substantive rights, including the right to parole absent 'some evidence' of current dangerousness." *Id*. at 611, *citing Hayward*, 603 F.3d at 561-63. *Pearson* also held that state law "gives rise to a liberty interest on the part of its prisoners covered by its parole system." *Id*.; *see also Cooke*, 606 F.3d at 1213 ("California's 'some evidence' requirement is a component of the liberty interest created by the parole system of that state"). Although other states have no duty to conform to the California system, "the California 'some evidence' requirement is enforceable on federal habeas review." *Id*. at 610. Consequently, federal habeas courts, in reviewing the merits of a federal habeas petition brought by a California prisoner who asserts that the decision to deny him parole was not supported by "some evidence" of his current dangerousness, must examine "whether the California judicial decision approving the governor's [or parole board's] decision rejecting parole was an 'unreasonable application' of the California 'some evidence'

requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"  *Id*. at 611, *citing Hayward*, 603 F.3d at 563.

The Court of Appeals for the Ninth Circuit recently explored the California "some evidence" standard:

> Under California law, "the paramount consideration for both the Board and the Governor" must be "whether the inmate currently poses a threat to public safety and thus may not be released on parole," . . . and "the facts relied upon by the Board or the Governor [must] support the ultimate decision that the inmate remains a threat to public safety."

*Cooke*, 606 F.3d at 1214 (internal citations omitted), *quoting In re Lawrence*, 190 P.3d 535, 552-54 (Cal. 2008).  The California Supreme Court held in *Lawrence* that "[t]he relevant determination for the Board and the Governor is, and always has been, an individualized assessment of the continuing danger and risk to public safety posed by the inmate."  *In re Lawrence*, 190 P.3d at 564.  In setting forth the standard for federal habeas courts, the Court of Appeals for the Ninth Circuit reiterated this principle, stating that "a reviewing court must consider 'whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.'"  *Cooke*, 606 F.3d at 1214, *quoting In re Lawrence*, 190 P.3d at 560.  Moreover, the California Supreme Court has expressly rejected the argument "that the aggravated circumstances of a commitment offense inherently establish current dangerousness."  *Lawrence*, 190 P.3d at 554.  The Board or the Governor may consider the circumstances of the commitment offense when making a parole decision, but

> the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the

commitment offense remain probative to the statutory determination of a continuing threat to public safety.

*Id.* at 555; *see also Hayward*, 603 F.3d at 562; *Cooke*, 606 F.3d at 1214.

Here, the California Supreme Court's decision identified the correct standard to be applied.  It cited, *inter alia*, *Dannenberg* and *Rosenkrantz*, both of which apply the "some evidence" standard of review for reviewing Board decisions granting or denying parole.  Thus, my task in the instant case is to determine whether the California Supreme Court's decision was an unreasonable application of the California "some evidence" standard to Velasquez's case.  Because the state court decision does not reveal which of the Board's findings it believes supported the denial of parole, and which, if any, did not, I must examine each of the Board's stated reasons for denying parole.  *Cooke*, 606 F.3d at 1214.

## IV.

In its decision denying parole, the Board focused heavily on the nature and circumstances of Velasquez's crime, observing that it was carried out in a "very cruel" and "extremely callous" manner, and that it was carried out "dispassionately" with "total disregard for the human suffering" of the victim.  The Board also thought the motive for the crime was "extremely trivial"; even though there was some dispute as to the motive, any of the possible motives were "extremely trivial," "whether it was because she was hitting you with her shoes, whether she bit your finger or whether it was because she was threatening to tell your wife of an affair you were having."  Velasquez told the Board that he had been using drugs heavily for some time prior to the crime, and was under the influence of drugs and alcohol on the night of the crime, but acknowledged that that did not mitigate the seriousness of his offense.  The recent case of *Pirtle v. California Board of Prison Terms* is useful for purposes of comparison on this

8

issue.  2010 WL 2732888 (9th Cir., July 12).  In that case, the Court of Appeals for the Ninth Circuit affirmed a district court's grant of habeas petition on the ground that the Board's decision to deny parole was not supported by "some evidence" of current dangerousness.  One of the Board's cited reasons for denial was the nature of Pirtle's commitment offense, which the Board opined was "especially cruel" and demonstrated an "exceptionally callous disregard for human suffering."  *Id*. at *5 (internal quotation marks omitted).  The circuit court found no support for that conclusion in the record, stating that there was no evidence that he tormented or terrorized his victim (his wife) prior to shooting her, or anything that made the shooting particularly cruel "on a comparative basis."  *Id*.  The Board also thought the crime was carried out in a "dispassionate calculated manner," but the circuit court again held that conclusion to be unfounded where the evidence actually supported a finding that he shot his wife when she told him that she was going to go home from the bar with another man; the court thought the evidence actually showed it was a crime of passion and not dispassionate or calculated.  *Id*.  The Board also opined that the motive was "trivial" but the circuit court disagreed, observing that the record showed that, "[t]he day after the couple agreed to try to save their failing marriage," he had watched his intoxicated wife dance with another man at a bar, and when he tried to take her home, she told him that she was going home with the other man; "[t]his public moment of rejection, betrayal, and infidelity created a motive that was hardly trivial or inexplicable."  *Id*. at *6.

    In Velasquez's case, the record likewise shows that the murder was not dispassionate or calculated, but arose out of a chaotic, unpremeditated altercation in which Velasquez was under the influence of alcohol and drugs.  As in *Pirtle*, there is some evidence that the motive was *not* trivial; several accounts suggest that the attack was prompted by the victim's threat to tell Velasquez's wife that he was

1   engaged in an extramarital affair.  On the other hand, unlike in *Pirtle*, there was

2   evidence in the record to support a conclusion that the motive *was* trivial, including

3   several other accounts by witnesses and by Velasquez advancing other motives for

4   the crime.  Moreover, the nature of this murder was terribly brutal, as the record

5   showed that the victim was stabbed 16 times with an ice pick and her throat was

6   slashed three times before her body was dumped in the trash.  It is true that the

7   aggravated nature of the crime is not evidence of current dangerousness without

8   more in the record showing that the prisoner's pre- or post-incarceration history or

9   his current mental state suggests that the dangerousness shown in the commitment

10  offense remains probative.  *Lawrence*, 190 P.3d at 555; *see also Hayward*, 603

11  F.3d at 562; *Cooke*, 606 F.3d at 1214.  But it is not error for the Board to consider

12  the circumstances of the commitment offense in combination with other factors.

13  *Lawrence*, 190 P.3d at 555.  Here, I do not conclude that the state court

14  unreasonably applied the "some evidence" standard by taking Velasquez's

15  commitment offense into account along with other facts that, taken as a whole,

16  might be construed to support a finding of current dangerousness.

17      Here, the Board also placed weight on Velasquez's prior criminal record,

18  which included robbery, several burglaries, and possession of marijuana.  The

19  Board opined that he "failed to profit from society's previous attempts to correct

20  his criminality," including juvenile counseling, a commitment by the California

21  Youth Authority, probation and parole.  This criminal record is somewhat more

22  grave than that in *Pirtle*, where, prior to committing murder, the prisoner had only

23  a handful of minor misdemeanors and one felony drunk driving offense.  2010 WL

24  2732888 at *6.  The Board also pointed to Velasquez's history of unstable social

25  history and drug use, and his continued use of drugs and alcohol for the first few

26  years he was in prison.  However, Velasquez told the Board that he had not used

10

any alcohol or drugs since 1985.  This is similar to the facts in *Pirtle*, in which the Board had found that the prisoner had an "unstable social history" based primarily on his alcohol abuse, but the circuit court held that that history was not evidence that Pirtle would be a danger to public safety 30 years later, where he had been sober for 22 years prior to the parole hearing and repeatedly expressed his commitment to sobriety.  *Id*. at *6-7.  Likewise, here, there was evidence that Velasquez had participated in Alcoholics Anonymous from 1992 on, and Narcotics Anonymous from 1994 on, and planned to continue to do so after parole.

The Board also focused on the fact that, prior to the Board's 2003 grant of parole, Velasquez did not participate meaningfully in self-help programs, and that in view of this lack of program participation, "there is not a comfortable feeling that the prisoner would behave differently if paroled."  The hearing transcript shows that, prior to 2003, he had participated in a Prisoner Outreach Program, a "Breaking Barriers" program in 1993-1994, and a ten-hour human development seminar in 2001; after 2003, he participated in two more programs, in "Creative Conflict Resolution" and "Stress Management."  Thus, there was evidence that Velasquez had participated in several self-help programs.  Moreover, the Board's concern that he had not sought more self-help is undermined by the fact that Velasquez had *no* disciplinary issues during his entire prison term, which suggests that Velasquez does not have difficulty coping with anger or stress.  *See Pirtle*, 2010 WL 2732888 at *7-8 (concluding that there was no evidence that Pirtle needed additional therapy or self-help or had difficulty coping with anger or stress where he received no serious disciplinary infractions during his 22 years of incarceration).  On the other hand, in *Pirtle*, the prisoner's psychological assessments had been "consistently positive."  *Id*.  Here, the Board examined Velasquez's most recent psychological evaluation, which opined that Velasquez

had had a history of substance abuse but that in prison he had been remarkably

discipline-free, had involved himself in a number of "pro-social activities" such as

self-help programs, and "for the most part, ha[d] made the most appropriate

personal, social and behavioral adjustments in this institutional setting. And there

is a high probability that [Velasquez] could continue to do this outside of prison."

The doctor opined that Velasquez had "gained a great deal of insight and

understanding" of his crime and had a lower risk of dangerousness than the

average inmate at his prison. The Board, however, discounted that recent

psychological report as "inconclusive, in that the assessment is done in comparison

to other inmates" and was "not a clear-cut assessment as to how [Velasquez] would

be able to function day to day in the community." The Board cited "counselors'

reports going back to 1989," most of which had not been supportive of parole, and

that some of the reports that were "just a little over 10 years old . . . were very

negative and showed that [Velasquez] really had no insight." No counselor since

1989 had given him a "resounding" assessment of low risk. There was some

evidence to support this conclusion. Prior psychological evaluations in the record

opine that: (1) "This examiner is not inclined to believe that the 12 years of

confinement . . . has altered 20 years of destructive and dysfunctional behavior. . . .

Velasquez leaves no claim that the great leaps of maturation have now occurred"

(November 1993); (2) "The Council admonished Mr. Velasquez for his lack of

consistency and follow through on his substance abuse programming. Mr.

Velasquez needs to learn to explore his feelings, rather than passively feeling like a

victim with no control over his life" (December 1993); (3) "Velasquez continues to

impress as non-insightful and self-absorbed. His lack of investment in addressing

his history of substance abuse is concerning. Whatever insights have been offered

to him over the years don't seem to stick" and suggested a diagnosis of antisocial

1    personality disorder (1995); (4) "it is difficult to say how much of a risk he would

2    be to resume substance abuse if he returned to the community . . . I would rather

3    doubt that he would" (1998); (5) "If he should succeed in remaining clean I would

4    see him as being almost a zero risk to become involved in violent behavior.

5    Insightful, he may not be, but neither is he . . . stupid" (date unclear); (6) "I doubt

6    that the inmate is a violence prone person.  This opinion would be even stronger if

7    he were to remain free of substance abuse following his release.  At age 52, he

8    looks strongly minded to live out his days peacefully" (1999); (7) Velasquez

9    continued to carry a diagnosis of antisocial personality disorder "but currently

10   evidences few symptoms of this and age and maturity seem to have decreased

11   aspects of his personality style" (2001).  His risk assessments over the years

12   included, "unpredictable," "low to moderate," "high" and "moderate to low."

13   None of the assessments were unequivocally positive.  Thus, this case is

14   distinguishable from *Pirtle* in this significant respect; Velasquez has not had

15   consistently or conclusively positive psychological evaluations.  *See Hayward*, 603

16   F.3d at 563 (holding that a state court decision approving the Governor's decision

17   rejecting parole was not an unreasonable application of the "some evidence"

18   requirement due to the nature of the commitment offense, which was

19   "premeditated and extremely vicious, and could not be attributed merely to

20   'stress,'" and the "somewhat unfavorable psychological and counselor reports,"

21   which included an assessment that he "would pose a 'low' to 'moderate' risk of

22   danger if released, as opposed to 'no' or merely 'low' risk").

23        Finally, the Board found that Velasquez's employment plans were "very

24   vague" and thus were not acceptable.  The Board acknowledged that Velasquez

25   had earned his GED and had become skilled in several vocations during his time in

26   prison, had received "above average work reports," and he never had any

13

disciplinary actions taken against him.  The Board heard evidence that Velasquez

had worked in landscaping for much of his life prior to his incarceration, first

working with his father and then owning his own business for about ten years, but

that he would likely need to buy all new equipment if he wanted to resume self-

employment in that field.  Velasquez told the Board he had not taken concrete

steps to explore the possibility of getting a landscaping job.  This is in stark

contrast to the cases of *Pirtle* and *Cooke*, where the prisoners had standing offers

of employment should they be paroled.  *Pirtle*, 2010 WL 2732888 at *7; *Cooke*,

606 F.3d at 1215.

There is a further ground for distinguishing *Pirtle*.  There, the Court of

Appeals for the Ninth Circuit applied a different, and less deferential, standard of

review; there was no reasoned decision by a state court to review, and thus the

court reviewed the parole board's reasons de novo.  *Pirtle*, 2010 WL 2732888

at *4.  This case is more like *Cooke*, where the last reasoned state court decision

held that the record contained "some evidence, including but certainly not limited

to the life offense, to support the board's denial of [Cooke's] parole."  *Cooke*, 606

F.3d at 1213.  Therefore, the circuit court reviewed that case to determine whether

the state court's decision "was an 'unreasonable application' of the California

'some evidence' requirement, or was 'based on an unreasonable determination of

the facts in light of the evidence."  *Id*.

Although there are many facts in this case that are similar to *Pirtle*, there are

material differences in this case, including the cruel nature of Velasquez's offense,

his criminal history prior to the murder, his lack of employment plans and apparent

lack of initiative in pursuing the same, and the fact that his psychological

assessments over the years have been inconsistent and, at times, negative.

A habeas court's role is not to determine whether it would have reached the same

1    result as the Board, but whether the state court's decision was *objectively*

2    *unreasonable* in concluding that the Board's decision was backed by "some

3    evidence."  Based on all of the above, I do not conclude that the California

4    Supreme Court's decision was an unreasonable application of the California "some

5    evidence" requirement, or that it was based on an unreasonable determination of

6    the facts in light of the evidence.

7                                    **V.**

8          Finally, I address Velasquez's additional argument that the 2005 denial of

9    parole violates his rights under the Ex Post Facto clause of the Constitution.  U.S.

10   Const. Art. I, § 10.  His position is essentially that the Board has imposed upon

11   him, ex post facto, the greater penalty of a life sentence.  However, the Ex Post

12   Facto Clause "is aimed at laws that 'retroactively alter the definition of crimes or

13   increase the punishment for criminal acts.'"  *Cal. Dep't of Corr. v. Morales*, 514

14   U.S. 499, 504-05 (1995).  Velasquez points to no change in law that has been

15   applied to him retroactively, and his original sentence of 15 years to life has not

16   been altered.  Velasquez fails to state a valid claim under the Ex Post Facto Clause.

17                                   **VI.**

18         For the foregoing reasons, Velasquez's petition for a writ of habeas corpus is

19   denied.

20

21   DATED: August 13, 2010              /s/ J. Clifford Wallace
                                         _____
22                                              J. Clifford Wallace
                                            United States Circuit Judge
23

24

25

26

                                        15